Slip Op. 21-125

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FULL MEMBER SUBGROUP OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>      Defendant,<br>and<br><br>CORNERSTONE BUILDING BRANDS, INC. ET AL.,<br><br>      Defendant-Intervenors. | Before: Claire R. Kelly, Judge<br><br>Court No. 20-00090<br>PUBLIC VERSION |

### OPINION

[Sustaining the U.S. International Trade Commission's final negative injury determination in its antidumping and countervailing duty investigations of fabricated structural steel from Canada, the People's Republic of China, and Mexico.]

Dated: September 22, 2021

Adam M. Teslik and Christopher B. Weld, Wiley Rein LLP, of Washington, DC, argued for plaintiff Full Member Subgroup of the American Institute of Steel Construction, LLC. Also on the briefs were Alan H. Price, Stephanie M. Bell, and Enbar Toledano.

John D. Henderson, Attorney-Advisor, Office of the General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation, U.S. International Trade Commission, of Washington, DC, argued for defendant United States. Also on the brief were Dominic L. Bianchi, General Counsel, and Karl S. von Schriltz, Attorney.

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, argued for defendant-intervenors Jinhuan Construction Group Co., Ltd.,

Wison (Nantong) Heavy Industry Co., Ltd., Shanghai Matsuo Steel Structure Co., Ltd., Yanda (Haimen) Heavy Equipment Manufacturing Co., Ltd., Shanghai Cosco Kawasaki Heavy Industries Steel Structure Co., Ltd., Modern Heavy Industries (Taicang) Co., Ltd., Dickerson Enterprises, Inc., and Steel Construction Group, LLC. Also on the brief were <u>Max F. Schutzman</u>, <u>Jordan C. Kahn</u>, and <u>Eve Q. Wang</u>.

<u>Matthew R. Nicely</u> and <u>Daniel M. Witkowski</u>, Akin, Gump, Strauss, Hauer & Feld LLP, of Washington, DC, argued for defendant-intervenor Cornerstone Building Brands, Inc.

<u>Christopher A. Dunn</u> and <u>Daniel L. Porter</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for defendant-intervenor BlueScope Buildings North America Inc.

<u>Richard L.A. Weiner</u> and <u>Rajib Pal</u>, Sidley Austin, LLP, of Washington, DC, for defendant-intervenors ExxonMobil Chemical Company, a Division of Exxon Mobil Corporation, and Gulf Coast Growth Ventures, LLC.

Kelly, Judge:   Before the court is Plaintiff Full Member Subgroup of the American Institute of Steel Construction, LLC's ("AISC", "Petitioner", or "Plaintiff") Rule 56.2 motion for judgment on the agency record challenging various aspects of the U.S. International Trade Commission's (the "Commission") final negative injury determination in its antidumping and countervailing duty ("ADD" and "CVD") investigations of fabricated structural steel ("FSS") from Canada, the People's Republic of China ("China") and Mexico.[1]  <u>See</u> [AISC's] Rule 56.2 Mot. J. Agency R., Sept. 21, 2020, ECF No. 52 ("Pl.'s Mot."); <u>[FSS] From Canada, China, and Mexico</u>, 85 Fed. Reg. 16,129 (Int'l Trade Comm'n Mar. 20, 2020) (deters.); <u>[FSS] from Canada,</u>

---

[1] The countervailing duty investigation concerning fabricated structural steel from Canada was terminated after the U.S. Department of Commerce determined that countervailable subsides were not being provided by Canada. <u>Certain [FSS] from Canada</u>, 85 Fed. Reg. 5387 (Dep't. Comm. Jan. 30, 2020) (final negative [CVD] deter.).

China, and Mexico, Investigation Nos. 701-TA-616-617 and 731-TA-1432-1434,

USITC Pub. 5031 (Mar. 2020) (Final), ECF No. 39-1 ("USITC Pub. 5031"); see also

Views of Comm'n and Separate and Dissenting Views of Schmidtlein and Karpel

(Confidential Version), Mar. 17, 2020, ECF No. 40-1 ("Final Views"); Final Staff

Report (Confidential Version), Feb. 12, 2020, ECF No. 40-2, revised by, Revisions

Final Staff Report (Confidential Version), Feb. 18, 2020, ECF No. 40-3, and Revisions

Final Staff Report (Confidential Version), Feb. 24, 2020, ECF No. 40-4 (collectively,

"Final Staff Report").   For the following reasons, the Commission's final negative

injury determination is sustained.

## BACKGROUND

On February 4, 2019, AISC filed petitions with the Commission and the U.S.

Department of Commerce ("Commerce") requesting ADD and CVD relief from

imports of FSS from Canada, China, and Mexico.[2]  Compl. ¶ 5, May 13, 2020, ECF

No. 9; Petitions Imposition of Antidumping and Countervailing Duties, PD 1, CD 1,

Doc. Nos. 665761, 665760 (Feb. 4, 2019) ("Petitions").[3]  AISC is a "trade association[,]

---

[2] Both Commerce and the Commission must come to affirmative conclusions in their
respective investigations into imports of the subject merchandise before an ADD or
CVD order can be issued.  See 19 U.S.C. §§ 1673d(c)(2), 1671d(c)(2) (2018).
[3] On June 22, 2020, Defendant submitted indices to the public and confidential
administrative records underlying the Commission's final determination.   These
indices are located on the docket at ECF Nos. 39 and 40, respectively.  All references
in this opinion to documents from the administrative record underlying the
Commission's final determination are identified by the numbers assigned by the
Commission in those indices and preceded by "PD" and "CD" to denote public or
confidential documents.

a majority of whose members manufacture, produce, or wholesale the domestic like

product in the United States." Compl. ¶ 3.  The petitions alleged that unfairly traded

imports of certain FSS caused or threatened to cause material injury to the domestic

industry.  Compl. ¶ 5; Petitions at 1.  On February 4, 2019, the Commission initiated

the preliminary phase of its investigation into the effects of imports of FSS from

Canada, China and Mexico into the United States on the domestic industry.  See

[FSS] From Canada, China, and Mexico, 84 Fed. Reg. 3245 (Int'l Trade Comm'n Feb.

11, 2019) (institution of [ADD] and [CVD] investigation and scheduling of prelim.

phase investigation).  The period of investigation ("POI") covered January 2015

through September 2018.  [FSS] from Canada, China, and Mexico, Investigation Nos.

701-TA-615-617 and 731-TA-1432-1434 (Prelim.) at 12, USITC Pub. 4878, (Mar.

2019) ("USITC Pub. 4878").  The Commission assessed the effect of subject imports

from Canada, China, and Mexico on the domestic industry on a cumulated basis after

determining that imports from these countries compete with each other and with the

domestic like product.  USITC Pub. 4878 at 19–21; see also Final Views at 35–38;[4] 19

U.S.C. § 1677(7)(G)(i).

---

[4] Citations to the public version of the Final Views can be found at the corresponding
page of USITC Pub. 5031 (e.g., USITC Pub. 5031 at 35–38 is the corresponding
citation in the public version of the Commission's Final Views for this citation).

The Commission defined "a single domestic like product consisting of all in-scope FSS." Final Views at 15. Commerce defined the scope in its ADD investigations as follows:

> The merchandise covered by the investigation is carbon and alloy fabricated structural steel. Fabricated structural steel is made from steel in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is two percent or less by weight. Fabricated structural steel products are steel products that have been fabricated for erection or assembly into structures, including, but not limited to, buildings (commercial, office, institutional, and multi-family residential); industrial and utility projects; parking decks; arenas and convention centers; medical facilities; and ports, transportation and infrastructure facilities. Fabricated structural steel is manufactured from carbon and alloy (including stainless) steel products such as angles, columns, beams, girders, plates, flange shapes (including manufactured structural shapes utilizing welded plates as a substitute for rolled wide flange sections), channels, hollow structural section (HSS) shapes, base plates, and plate-work components. Fabrication includes, but is not limited to cutting, drilling, welding, joining, bolting, bending, punching, pressure fitting, molding, grooving, adhesion, beveling, and riveting and may include items such as fasteners, nuts, bolts, rivets, screws, hinges, or joints.
>
> The inclusion, attachment, joining, or assembly of non-steel components with fabricated structural steel does not remove the fabricated structural steel from the scope.
>
> Fabricated structural steel is covered by the scope of the investigation regardless of whether it is painted, varnished, or coated with plastics or other metallic or non-metallic substances and regardless of whether it is assembled or partially assembled, such as into modules, modularized construction units, or sub-assemblies of fabricated structural steel.
>
> Subject merchandise includes fabricated structural steel that has been assembled or further processed in the subject country or a third country, including but not limited to painting, varnishing, trimming, cutting, drilling, welding, joining, bolting, punching, bending, beveling, riveting, galvanizing, coating, and/or slitting or any other processing that would

> not otherwise remove the merchandise from the scope of the
> investigation if performed in the country of manufacture of the
> fabricated structural steel.
>
> All products that meet the written physical description of the
> merchandise covered by the investigation are within the scope of the
> investigation unless specifically excluded or covered by the scope of an
> existing antidumping duty order.

Certain [FSS] from Canada, 85 Fed. Reg. 5373, 5375 (Dep't Com. Jan. 30, 2020) (final

deter. of sales at less than fair value); Certain [FSS] from [China], 85 Fed. Reg. 5376,

5379 (Dep't Com. Jan. 30, 2020) (final affirmative deter. of sales at less than fair

value); Certain [FSS] from Mexico, 85 Fed. Reg. 5390, 5392–93 (Dep't Com. Jan. 30,

2020) (final deter. of sales at less than fair value).

Commerce defined certain enumerated exclusions from the scope of its

investigation.   See, e.g., Certain [FSS] from Mexico, 85 Fed. Reg. at 5393–94.

Relevant to this dispute is the third exclusion:

> Pre-engineered metal building systems, which are defined as complete
> metal buildings that integrate steel framing, roofing and walls to form
> one, pre-engineered building system, that meet Metal Building
> Manufacturers Association guide specifications.  Pre-engineered metal
> building systems are typically limited in height to no more than 60 feet
> or two stories.

Id. at 5393.

On February 12, 2020, the Commission issued its final staff report.   See

generally Final Staff Report.[5]  On February 25, 2020, in a split vote, the Commission

---

[5] Citations to the public version of the Final Staff Report can be found at the
corresponding page of USITC Pub. 5031, beginning at page I-1.

determined that the domestic industry was not materially injured by imports of subject FSS.  <u>See</u> Commission Meeting Transcript, <u>[FSS] from Canada, China, and Mexico</u>, Investigation Nos. 701-TA-615-617 and 731-TA-1432-1434 (Final), PD 407, Doc. No. 703488 (Feb. 25, 2020).  Three Commissioners voted in the negative ("the Majority"), while two Commissioners voted in the affirmative.  <u>Id.</u> at 4.  Notice of the negative determination was published on March 20, 2020.  <u>[FSS] From Canada, China, and Mexico</u>, 85 Fed. Reg. 16,129 (Int'l Trade Comm'n Mar. 20, 2020).

This appeal ensued.  <u>See</u> Summons, Apr. 17, 2020, ECF No. 1; Compl.  Plaintiff brought the instant motion for judgment on the agency record, the parties briefed the issues, and the court conducted oral argument on the matter.  <u>See</u> [AISC's] Memo. in Supp. of [Pl.'s Mot.], Sept. 21, 2020, ECF No. 55 ("Pl.'s Br."); Def. United States' Memo. in Opp'n to [Pl.'s Mot.], Dec. 4, 2020, ECF No. 58 ("Def.'s Br."); Resp. in Opp'n to [Pl.'s Mot.] of Def.-Intervenors Jinhuan Construction Group Co., Ltd., Wison (Nantong) Heavy Industry Co., Ltd., Shanghai Matsuo Steel Structure Co., Ltd., Yanda (Haimen) Heavy Equipment Manufacturing Co., Ltd., Shanghai Cosco Kawasaki Heavy Industries Steel Structure Co., Ltd., Modern Heavy Industries (Taicang) Co., Ltd., Dickerson Enterprises, Inc., and Steel Construction Group, LLC (collectively, "GDLSK Respondents"), Dec. 30, 2020, ECF No. 60 ("GDLSK's Br."); Def.-Intervenors Cornerstone Building Brands, Inc. & BlueScope Buildings North America, Inc.'s Memo. in Opp'n to [Pl.'s Mot.], Dec. 30, 2020, ECF No. 62 ("CBB-

BlueScope's Br."); Reply Br. of [AISC], Jan. 28, 2021, ECF No. 63 ("Pl.'s Reply Br.");

Oral Arg., May 6, 2021, ECF No. 73.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[6] and 28 U.S.C. § 1581(c)

(2018), which grant the court authority to review actions contesting a final

affirmative injury determination.  "The court shall hold unlawful any determination,

finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    The Commission's Inclusion of NCI and BlueScope's Data

Plaintiff asserts that the Commission should have excluded data from NCI

Group, Inc. ("NCI") and BlueScope Buildings North America, Inc. ("BlueScope") as

out-of-scope.  See Pl.'s Br. at 41–46.  Plaintiff contends that NCI and BlueScope

included data for out-of-scope complete PEMBS and non-FSS components of PEMBS.

See id.  Defendant counters that the Commission's reliance on NCI and BlueScope's

reported data was reasonable, noting that the Commission confirmed that NCI and

BlueScope only reported data relating to shipments of in-scope domestic like product.

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2018 edition.

See Def.'s Br. at 39–45.  Defendant-Intervenors Cornerstone Building Brands, Inc.

("CBB")[7] and BlueScope argue that NCI and BlueScope did not report data relating

to excluded PEMBS or non-FSS components.  See CBB-BlueScope's Br. at 4–15.  For

the following reasons the Commission's inclusion of data from NCI and BlueScope is

reasonable.

The Commission shall determine whether a domestic industry is materially

injured by reason of subject imports.  See 19 U.S.C. § 1671d(1).  The domestic industry

consists of "producers as a whole of a domestic like product."  19 U.S.C. § 1677(4)(A).

The "domestic like product" is "a product which is like, or in the absence of like, most

similar in characteristics and uses with, the article subject to an investigation."  Id.

§ 1677(10).  The Commission conducts a like product analysis in light of the scope as

determined by Commerce using a variety of factors.  See, e.g., Nippon Steel Corp. v.

U.S., 19 CIT 450, 454–55 (1995); see Torrington Co. v. United States, 14 CIT 648,

650–52, 651 n.3 (1990), aff'd, 938 F.2d 1278, 1280 (Fed. Cir. 1991); USEC v. United

States, 34 F. App'x 725, 730 (Fed. Cir. 2002).  In analyzing the domestic industry and

the domestic like product, the Commission may not act arbitrarily.  See Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41 (1983).  The

---

[7] Defendant-Intervenor CBB states that it is "a U.S. producer of fabricated structural steel and was known as NCI Building Systems, Inc. prior to changing its name in 2019, during the pendency of the Commission's investigation."  CBB-BlueScope's Br. at 1 n.1.  According to CBB, it "maintains an operating subsidiary called [NCI], which completed U.S. producer and U.S. importer questionnaires during the Commission's investigation."  Id.

**PUBLIC VERSION**

Commission's determinations must be supported by substantial evidence.  <u>See</u> 19

U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  <u>Universal</u>

<u>Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951).  The possibility of drawing two

inconsistent conclusions from the evidence does not prevent the court from holding

that the Commission's findings are supported by substantial evidence.  <u>See</u> <u>Nippon</u>

<u>Steel Corp. v. United States</u>, 458 F.3d 1345, 1352 (Fed. Cir. 2006).  However, the

Commission must provide an explanation for those conclusions it draws from the

record that reasonably addresses relevant arguments made by interested parties.

19 U.S.C. § 1677f(i)(3)(B); <u>State Farm</u>, 463 U.S. at 48–49.

     Here, the Commission defined the domestic like product as coextensive with

Commerce's scope determination, and included NCI and BlueScope's data, explaining

that its staff ensured NCI and BlueScope did not report any data that were excluded

from the scope.  <u>See</u> Final Views at 63 n.304.  That scope included "steel products

that have been fabricated for erection or assembly into structures" regardless of

whether that FSS was necessary to support design loads.  Final Scope Decision

Memo. Re: [FSS] from Canada, Mexico, and [China] at 2, 27, PD 353, Doc. No. 702277

(Jan. 23, 2020) ("Final Scope Decision Memo").

     It is reasonably discernible that the Commission concluded that non-load-

bearing FSS components were in-scope, and that data relating to such components

were properly included. Therefore, the Commission's determination that NCI and

BlueScope did not include data for out-of-scope merchandise was in accordance with law and supported by the record.  The Commission's decision to include data relating to non-load-bearing steel components of PEMBS is in accordance with Commerce's scope ruling.  See Final Scope Decision Memo. at 26–27.  Commerce explained that any FSS that is incorporated into a structure, regardless of whether such FSS "is essential to support the design loads of the structure" is in-scope.  Id.  Given Commerce's explanation, the Commission reasonably included data from NCI and BlueScope for such FSS components of PEMBS.  Plaintiff's contention that steel components that are not "structural" in the sense that they are not load bearing should have been excluded contravenes Commerce's explanation of what FSS encompasses.  Thus, Plaintiff's claim that the Commission's failure to define "out-of-scope PEMB[S] components" allowed NCI and BlueScope "to define for themselves what they considered 'out-of-scope,'" which resulted in a flawed data set, does not withstand scrutiny.  See Pl.'s Br. at 43; see also Pl.'s Reply Br. at 21.

The Commission instructed NCI and BlueScope to exclude out-of-scope merchandise and followed up to "determine what specific components each producer had included . . . as in[-]scope merchandise."  Final Views at 63 n.304.  The Commission "reviewed the questionnaire responses . . . closely and examined the data they submitted in light of what Commerce indicated in its final scope definition was within or outside the scope."  Id.  After the hearing, the Commission specifically directed counsel for NCI and BlueScope that "[i]f you produce or import out-of-scope

**PUBLIC VERSION**

PEMB[S] components, <u>do not</u> include such products in either production or imports –
even if assembled into [PEMBS] that you sell." <u>Id.</u> (emphasis in original).  The
Commission further obtained shipment data from NCI and BlueScope to determine
which specific PEMBS components were included as in-scope merchandise and which
components were excluded as out-of-scope merchandise.  <u>Id.</u> at 64 n.304.  The
Commission also verified the financial data submitted by NCI.[8]  <u>Id.</u>  The
Commission's decision to use all the data submitted by NCI and BlueScope was thus
made after a proper review of the record.  Given the Commission's documented efforts
to ensure that the NCI and BlueScope data was in-scope, Plaintiff's assertion that
the Commission acted arbitrarily is baseless.  The Commission assured itself that
only in-scope data was included, and its determination is reasonable on this record.

　　　　Finally, contrary to Plaintiff's interpretation of who constructs PEMBS, the
record indicated that the "producers of FSS components of PEMBS" did not construct
the completed PEMBS, rather builders constructed the completed PEMBS.  Final
Views at 43; <u>see also</u> Pl.'s Br. at 46–47.  The Commission concluded that the producers
of FSS did not captively consume the FSS components of PEMBS but merely
aggregated them.  <u>Id.</u>  As discussed further below, the record supports the

---

[8] Plaintiff argues that this verification is irrelevant, as it relates to sales figures that
should not have been included in the first place.  Pl.'s Br. at 45.  However, the
Commission staff had also verified that only in-scope merchandise that been reported.
<u>See</u> Verification Report of NCI Group, Inc., <u>[FSS] from Canada, China, and Mexico
Investigation Nos. 701-TA-615-617 and 731-TA-1432-1434</u> (Final) (Confidential
Version) CR 1028 (Feb. 5, 2020).

Commission's determination.  <u>See</u> Revised and Corrected Commission Hearing

Transcript at 204 (Pasley), PD 409, Doc. No. 704509 (Mar. 10, 2020) ("Hearing

Transcript"); <u>see also</u> Post-Hearing Br. BlueScope Buildings North America and

Butler de Mexico at 13, PD 341, CD 1005, Doc. Nos. 701534, 701430 (Feb. 4, 2020)

("BlueScope's Post-Hearing Br."); Final Staff Report at III-22 n.12, Table E-9; Post-

Hearing Br. [CBB] and Building Systems de Mexico, S.A. de C.V., App. A at 16–17,

PD 342, CD 1004, Doc. No. 701540 (Feb. 4, 2020) ("CBB & BSM's Post-Hearing Br.").

Thus, the Commission reasonably determined that BlueScope and NCI did not

improperly report data in connection with completed PEMBS.

## II.     **Failure to Collect Certain Data**

Plaintiff argues that the Commission's failure to seek out "pricing product

data"[9] or bid data relating to initial offers for projects involving the sale of FSS from

both purchasers and producers (or fabricators) for the final phase of its investigation

was unlawful and led to an inadequate record.  <u>See</u> Pl.'s Br. at 21–26, 39 (citing, inter

alia, <u>Allegheny Ludlum Corp. v. United States</u>, 287 F.3d 1365, 1373 (Fed. Cir. 2002)).

Defendant contends that Plaintiff's challenge is essentially an objection to the

reasonableness of the Majority's analysis, and that the Commission's collection of

data in this case was appropriate and reasonable.  Def.'s Br. at 25–30.  For the

---

[9] The parties use the phrase "pricing product data" to describe "quarterly data for the total quantity and f.o.b. value of . . . fabricated structural steel products shipped to unrelated U.S. customers".  <u>See</u> USITC Pub. 4878 at V-8.

**PUBLIC VERSION**

following reasons the Commission's methodological choices were reasonable and in

accordance with law.

The Commission shall determine whether a domestic industry is materially

injured (or threatened with material injury) by reason of subject imports.  See 19

U.S.C. § 1671d(b)(1).  "Material injury" means "harm which is not inconsequential,

immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).  In each case, the Commission

shall consider:

> (I) the volume of imports of the subject merchandise,
> (II) the effect of imports of that merchandise on prices in the United
> States for domestic like products, and
> (III) the impact of imports of such merchandise on domestic
> producers of domestic like products, but only in the context of
> production operations within the United States[.]

Id. § 1677(7)(B)(i)(I)–(III).  The Commission may also "consider such other economic

factors as are relevant to the determination regarding whether there is material

injury by reason of imports." Id. § 1677(7)(B)(ii).  As long as the Commission considers

all three mandatory factors, its "methodology and procedures are reasonable means

of effectuating the statutory purpose, and there is substantial evidence in the

record supporting the agency's conclusions, the court will not impose its own

views as to the sufficiency of the agency's investigation or question the agency's

methodology." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05

(1986) (citing Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843

(1984)); see also <u>Angus Chem. Co. v. United States</u>, 140 F.3d 1478, 1485 (Fed. Cir. 1998).

The Commission reasonably declined Petitioner's request to solicit additional pricing product data or bid data for the final phase of its investigation. Although FSS is primarily sold through a bidding process, the Commission initially requested pricing product data from U.S. producers and importers regarding the effects of subject imports from Canada, China, and Mexico on FSS sales in the United States. <u>See</u> USITC Pub. 4878 at V-8.[10] The Commission also requested that U.S. producers report instances of lost sales or revenue resulting from FSS imports from Canada, China, and Mexico ("lost sales and revenue survey"), <u>see id.</u> at V-13, which it

---

[10] The Commission requested pricing product data based on six categories proposed by AISC in its petitions:

> Product 1.—Fabricated light structural, Grade 50, 0-19 lbs. per linear foot, sold for industrial projects.
> Product 2.—Fabricated medium structural, Grade 50, 20-119 lbs. per linear foot, sold for industrial projects.
> Product 3.—Fabricated extra heavy structural, Grade 50, 120 lbs. or greater per linear foot, sold for industrial projects.
> Product 4.—Fabricated structural steel sold for schools, libraries, labs, and hospitals, 2-4 stories.
> Product 5.—Fabricated structural steel sold for office buildings, multi-family residential buildings, and mixed-use buildings, 5-19 stories.
> Product 6.—Fabricated structural steel sold for office buildings, multi-family residential buildings, and mixed-use buildings, 20 stories and greater.

<u>Id.</u>

considered alongside other sources such as official import statistics from Commerce and publicly available index data on FSS prices.  See id. at 4–5, V-7.  However, the Commission encountered difficulties with the pricing product data it collected for the preliminary phase, and "request[ed] that the parties in their comments on the draft questionnaires suggest the best way for the Commission to collect comparable pricing data for the domestic like product and the subject imports."  Id. at 31.  On August 5, 2019, the Commission circulated to the parties a draft of its final phase questionnaires, and Petitioner made several suggestions.[11]  See Draft Questionnaires and accompanying Letter, PDs 97–98, Doc. Nos. 684283, 6842844 (Aug. 5, 2019).  The Commission implemented some, but not all, of the suggestions offered during the preliminary phase as to how to conduct its investigation.  See, e.g., Def.'s Br. at 26–

---

[11] First, Petitioner maintained that the Commission should continue collecting pricing product data and proposed an additional product category calling for "quarterly price data for all [FSS] sold by [the respondent's] firm."  See Pet'r's Draft Questionnaire Cmts. at 8–9, PD 116, CD 314, Doc. Nos. 687192, 687029 (Sept. 3, 2019).  Additional time to conduct the final phase, Petitioner argued, would mitigate many of the difficulties experienced by the Commission in collecting usable pricing product data during the preliminary phase.  Id. at 6–7.  According to Petitioner, even if the collected pricing product data suffered limitations, it would still be useful to complement or corroborate the bid data.  Id. at 8.  Second, in addition to requesting data from U.S. purchasers of FSS, Petitioner urged the Commission to expand its questionnaire to include bid data from U.S. and foreign producers of FSS.  Id. at 10–11.  Petitioner explained that fabricators/producers of FSS would be better positioned to itemize total bid prices in such a way as to enable the Commission to isolate the FSS component of final bids.  Id.  Third, Petitioner requested that the Commission seek data on initial bid amounts for sales of FSS.  Id. at 11.  Petitioner submitted that implementing its request would allow the Commission to conduct a representative comparison of FSS prices that reflects any price changes that occurred between rounds of bidding in response to subject imports.  See id. at 10–11.

27 (citing Pet'r's Cmts. on Draft Questionnaires, PD 116, CD 314, Doc. Nos. 687192,

687029 (Sept. 3, 2019) ("Pet'r's Draft Questionnaire Cmts."), Final Questionnaires,

PD 154 (Oct. 4, 2019)).

    Although the Plaintiff argues that the Commission ignored its suggestions,

Pl.'s Br. at 21–22, the Commission reasonably determined that requesting additional

pricing product data would not lead to probative evidence.  See Final Views at 52–53.

The Commission noted irregularities with the data and difficulties it encountered

when soliciting responses from U.S. producers during the preliminary phase.  See id.

at 52–53, 53 n.256.  The Commission explained that Petitioner's suggestion to collect

pricing product data for the same six categories, plus an additional seventh category

consisting of all FSS, did little to address the problems the Commission encountered

in the preliminary phase of the investigations.  See id. at 52–53, 53 nn.254, 256.  The

Commission's preliminary request for pricing product data produced responses that

all parties that address this issue acknowledge were flawed and of limited probative

value.  See Pl.'s Br. at 21–23; Def.'s Br. at 30–31; GDLSK's Br. at 14–15. The

Commission's determination that further requests for the same data would be

unhelpful is reasonable.  It may be, as Petitioner speculated in its comments, that the

inclusion of one additional product pricing category in the Commission's final phase

questionnaire and more time to conduct the final phase of the investigation would

have mitigated difficulties the Commission encountered during the preliminary

phase.  Pet'r's Draft Questionnaire Cmts. at 8–9.  However, an alternative reasonable

**PUBLIC VERSION**

approach does not render the Commission's determination unreasonable.  See Nippon

Steel Corp., 458 F.3d at 1352.

The Commission also requested bid data from purchasers, but not from

producers or fabricators, and limited its request to bid data relating to final offers.

See Final Questionnaire at 28–30.  The Commission observed that Petitioner

"acknowledged in the petitions that the customized nature of FSS and the bid process

imposed limitations on the usefulness of both pricing product data and bid data for

FSS," and that "[t]he petitions specifically cited a previous investigation in which the

Commission had explained that its 'conventional {pricing product} approach to

pricing' was 'not useful' in that investigation given the custom nature of the products

and the bidding process through which they were sold."  Final Views at 53 n.256

(citing Petitions at 27); see also Large Power Transformers from Korea Investigation

No. 731-TA-1189 (Prelim.) at 16, USITC Pub. 4256 (Sept. 2011) ("USITC Pub. 4256").

It is reasonably discernible, based on the Commission's reference to Large Power

Transformers from Korea, that past investigations dealing with subject merchandise

that are custom-made for specific projects and sold through a bidding process

informed the Commission's decision to limit its request to final bid data from U.S.

purchasers.[12]  See Final Views at 53 n.256.

---

[12] For example, in Large Power Transformers from Korea, the Commission requested

(footnote continued)

Plaintiff's assertions that the Commission should have requested initial bid data and that the Commission should have broadened its requests to include bid data from fabricators, fail for similar reasons.  See Pl.'s Br. at 21–22, 38–39.  As discussed, it is reasonably discernible that the Commission preferred to request bid data from purchasers because requests for bid data from fabricators or producers would result in comparability issues.  See Final Views at 53 n.256; see also, e.g., Engineered Process Gas Turbo-Compressor Systems from Japan, Investigation No. 731-TA-748 (Final) at V-4 n.16, USITC Pub. 3042 (Jun. 1997) ("Since bid prices presented by individual suppliers may differ in their scope, information from contractors/end users is more reliable in terms of comparing bids from different suppliers, since it is more likely that all bids presented will cover an equivalent scope.").[13]

---

bid data from producers and fabricators, but found that the information submitted was not sufficient to permit identification of instances where U.S. produced subject merchandise compete with subject imports for the same sales.  USITC Pub. 4256 at 16.  Indeed, Defendant points out, and Plaintiff does not dispute, that in the three most recent investigations cited by Plaintiff, the Commission limited its examination to final bid data from purchasers.  See Def.'s Br. at 29 (citing Utility Scale Wind Towers from China and Vietnam, Investigation Nos. 701-TA-486 and 731-TA-1195-1196 (Final) at 22, USITC Pub. 4372 (Feb. 2013); 100- to 150- Seat Large Civil Aircraft from Canada, Investigation Nos. 701-TA-578 and 731-TA-1368 (Final) at V-10, USITC Pub. 4759 (Feb. 2018); Large Diameter Welded Pipe from China and India, Investigation Nos. 701-TA-593-594 and 731-TA-1402 and 1404 (Final) at 43, USITC Pub. 4859 (Jan. 2019)).

[13] Plaintiff invokes Allegheny for the proposition that the Commission has an obligation to seek out more information than it did in this case.  Pl.'s Reply Br. at 4–5.  In Allegheny, the U.S. Court of Appeals for the Federal Circuit held that the Commission must seek out all relevant information before resorting to the "product

(footnote continued)

### III.   The Commission's Refusal to Apply Captive Production Provisions

The Commission's determination not to apply the captive production provision
of the statute, see 19 U.S.C. § 1677(7)(C)(iv), is reasonable and supported by
substantial evidence.   The Commission determined that aggregation of FSS
components with non-FSS components into PEMBS "kits" does not constitute
"production of a downstream article" within the meaning of the statute.   See Final
Views at 43; see also 19 U.S.C. § 1677(7)(C)(iv).   Plaintiff argues that the relevant
downstream article is a complete PEMBS, which Plaintiff asserts is indistinguishable
from a PEMBS kit.  See Pl.'s Br. at 46.  Plaintiff further argues that the PEMBS kits
themselves are downstream articles.   Id. at 48–49.   Defendant asserts the
Commission's determination not to apply the captive production provision was
reasonable because builders, not FSS producers, produce PEMBS, so FSS is not
internally transferred for the production of a downstream article.  Def.'s Br. at 46–
47.  Defendant further argues that it was reasonable for the Commission to determine
that aggregation of PEMBS components without any assembly was "not tantamount
to a downstream article 'produced' from an in-scope article."  Id. at 46 (quoting Final
Views at 43 n.188).  NCI and BlueScope contend that the Commission's determination
not to apply the captive production provision was reasonable and that the

---

line provision" of the statute, see Allegheny 287 F.3d at 1372, but the parties do not
argue that the product line provision is applicable in this instance.  See 19 U.S.C.
§ 1677(4)(D).  Therefore, Alleghany is not applicable.

Commission's interpretation of the statute is entitled to deference.  CBB-BlueScope's

Br. at 17–19.  For the following reasons, the Commission's decision not to apply the

captive production provision is reasonable and supported by substantial evidence.

For the captive production provision to apply, the threshold condition that

domestic producers internally transfer domestic like product for the production of a

downstream article and sell a significant production of the domestic like product in

the merchant market must be met.[14]   If the threshold condition is met, the

Commission will consider whether the downstream article enters the merchant

market and whether the domestic like product is the predominant material input in

---

[14]  Captive production is defined by the statute as follows,

> If domestic producers internally transfer significant production of the
> domestic like product for the production of a downstream article and sell
> significant production of the domestic like product in the merchant
> market, and the commission finds that—
>
>> (I) the domestic like product produced that is internally transferred
>> for processing into that downstream article does not enter the
>> merchant market for the domestic like product, and
>>
>> (II) the domestic like product is the predominant material input in
>> the production of that downstream article,
>
> then the Commission, in determining market share and the factors
> affecting financial performance set forth in clause (iii), shall focus
> primarily on the merchant market for the domestic like product.

19 U.S.C. § 1677(7)(C)(iv).  Sales in the "merchant market" refers to sales to unrelated
customers.  <u>See</u> Uruguay Round Agreements Act, Statement of Administrative
Action, H.R. Doc. No. 103–316, vol. 1, at 852 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N.
4040, 4185 ("SAA").

production of the downstream article. 19 U.S.C. § 1677(7)(C)(iv). The term "internally transfer[red] . . . for the production of a downstream article" is further defined by Congress to mean "processed into a higher-valued downstream article by the same producer." <u>See</u> Uruguay Round Agreements Act: Statement of Administrative Action, H. Doc. 103–316, at 852 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4185 ("SAA"); <u>see also</u> 19 U.S.C. § 1677(7)(C)(iv).[15]

Neither the statute nor the SAA further define "production of a downstream article," or "processing into a distinct downstream article."[16] If the statute is ambiguous, the court defers to the Commission's interpretation as long as that interpretation is permissible under the statute.[17] <u>See</u> <u>Chevron</u>, 467 U.S. at 843. The

---

[15] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

[16] Plaintiff argues that the Commission did not discuss processing in its Final Views, <u>see</u> Pl.'s Reply Br. at 23, but it is reasonably discernible from the Commission's reliance on the SAA's explanation of the threshold condition that the term "for the production of a downstream article" necessarily encompassed the SAA's elucidation of that term to mean "processing into a downstream article." <u>See</u> Final Views at 42–43; SAA at 852.

[17] "Production" is defined by the Oxford English Dictionary as, "The action of making or manufacturing from components or raw materials, or the process of being so manufactured." https://www.lexico.com/en/definition/production (last visited Sept. 16, 2021). Likewise, the Oxford English Dictionary defines "produce" as, "Make or manufacture from components or raw materials." https://www.lexico.com/definition/produce (last visited Sept. 16, 2021). "Make" is defined as "Form (something) by putting parts together or combining substances;

(footnote continued)

**PUBLIC VERSION**

common meanings of these words do not compel any specific interpretation of the

terms "production of a downstream article," or "processing into a distinct downstream

article"; therefore, the Commission's construction will be upheld as long as it is

permissible.  See id.

Here, the Commission found that the threshold condition of the statute was

not met because aggregation of FSS and non-FSS components of PEMBS did not

constitute production of a downstream article and that unrelated builders, not FSS

producers, produced the downstream article PEMBS.   Final Views at 43.   The

Commission further found that PEMBS themselves, not the aggregated components,

were the downstream articles produced from the in-scope FSS.   See id. at 43 n.188

("Aggregation of components, without any assembly by the domestic producer, is not

tantamount to a downstream product 'produced' from in-scope articles").   The

Commission's determination that PEMBS kits are not downstream articles that are

produced using domestic like product was a reasonable interpretation of the statute.

No party contends that FSS used in the construction of PEMBS is changed via large-

scale assembly with machines or subjected to "a series of mechanical or chemical

operations . . . to change it" after it is initially manufactured, but before it is used by

---

create," and "manufacture" is defined as "Make (something) on a large scale using
machinery."  See https://www.lexico.com/definition/make (last visited Sept. 16, 2021);
https://www.lexico.com/definition/manufacture (last visited Sept. 16, 2021).  Finally,
the Oxford English Dictionary defines "process" as, "Perform a series of mechanical
or chemical operations on (something) in order to change or preserve it."  See
https://www.lexico.com/definition/process (last visited Sept. 16, 2021).

builders        in        the        construction        of        PEMBS.                <u>See</u>
https://www.lexico.com/definition/manufacture   (last   visited   Sept.   16,   2021);
https://www.lexico.com/definition/process (last visited Sept. 16, 2021).   The parties
agree that after FSS for use in PEMBS is manufactured, it is either aggregated with
other PEMBS components and shipped to job sites or else shipped directly to job sites
without being aggregated.[18]  <u>See</u> Pl.'s Br. at 46; Def.'s Br. at 47; CBB-BlueScope's Br.
at 21–22.

Plaintiff does not contend that the threshold condition is unambiguous or that
the Commission's construction of the threshold condition is contrary to the clear
intent of Congress.  <u>See</u> Pl.'s Reply Br. at 23–24.   Rather, Plaintiff asserts that the
Commission's brief sets forth a post-hoc rationalization of the Commission's
determination that was not set forth in the Final Views.  <u>Id.</u> at 23.   Specifically,
Plaintiff argues that the Commission's determination focuses only on whether
PEMBS kits are a downstream article, not that FSS is further processed to produce
a downstream article.  <u>Id.</u> at 23.  Plaintiff misinterprets the Commission's analysis of
the threshold condition.  The Commission interpreted the statute as requiring that a
"downstream article" be "further processed" in order to be produced.  <u>See</u> Final Views

---

[18] Plaintiff asserts that FSS is [[

            ]]; however, it is reasonably discernible that the Commission determined
that [[                                                    ]] is not equivalent to "production" or
"processing."  <u>See</u> Reply Br. of [AISC] (Revised Confidential Version), at 24, Feb. 1,
2021, ECF No. 65; Final Views at 43.

at 42–43, 43 n.188.  Because PEMBS kits were aggregated and not processed, PEMBS

kits did not constitute a downstream article that was produced from in-scope FSS

under the statute.  Id. at 43.  Plaintiff's argument that the Commission acted contrary

to law because the legislative history does not support the Commission's position fails

to persuade.  See Pl.'s Br. at 46–48.  Indeed, the legislative history quoted by the

Plaintiff refers to whether a distinct article is "produced from that product."  Id. at

47–48 (quoting Final Views at 43 n.188 and SAA at 852).  It is reasonably discernable

that the Commission concluded that producing one product from another requires

more than aggregation. The Commission's interpretation is reasonable.

Moreover, the Commission's determination is supported by substantial

evidence.  Plaintiff argues that the distinction between a PEMBS kit and a complete

PEMBS is "arbitrary [and] unsupported by the record."  Pl.'s Br. at 46.  However, the

distinction is made not by the Commission but by Commerce in the Final Scope

Determination, in which Commerce states, "[p]re-engineered metal building systems,

which are defined as complete metal buildings that integrate steel framing, roofing

and walls to form one, pre-engineered building system, that meet Metal Building

Manufacturers Association guide specifications" are "excluded from the scope of these

investigations."  Final Scope Decision Memo at 3.  BlueScope asserts that it does not

consume the FSS in the manufacture of a downstream product.  Hearing Transcript

at 204 (Pasley); see also U.S. Producers' Questionnaire [Revised] Resp. of [BlueScope]

at IV-7, CD 547, Doc. No. 694313 (Nov. 8, 2019).  BlueScope explains that it "produces

FSS, which it ships, usually in stages, to the building site.  There, the FSS is ultimately assembled by the builder into a completed building."  Id.; see also BlueScope's Post-Hearing Br. at 13 ("BlueScope does not captively consume its production of PEMBS components").  BlueScope further testified that it ships FSS to the site, where the builder assembles the FSS and other materials into a complete building.  Id.; see also Final Staff Report at III-22 n.12, Table E-9.  Likewise, record evidence from CBB and Building Systems de Mexico S.A. de C.V. ("BSM") supports the Commission's findings that NCI and BlueScope did not internally transfer FSS for further processing into a downstream article.  See CBB & BSM's Post-Hearing Br., Appx. A at 16–17.  Thus, there is substantial evidence to support the Commission's determination that U.S. producers do not captively consume FSS for the production of downstream articles, but rather that they produce FSS which is then used by unrelated parties to produce the downstream PEMBS. See Final Views at 43.

Contrary to Plaintiff's suggestion, the Commission's interpretation of what constitutes a complete PEMBS is not "absurd." See Pl.'s Reply Br. at 25.  The Commission determined that, "in nearly all instances, it is not the producers of FSS components of PEMBS that produce a finished PEMBS; rather it is the builders that construct a complete PEMB[S] from the various components in the kit, or by combining the in-scope components it purchases from the producer with other

materials that it purchases separately."[19]   Final Views at 43.   Plaintiff argues that

there is no difference between a completed building and the parts used in its

construction, see Pl.'s Br. at 46, however, it was not unreasonable for the Commission

to find that completed PEMBS (i.e. buildings) are distinguishable from their

component parts, regardless of whether those components are aggregated and sold

together as a kit.   Indeed, Plaintiff appears to have understood this distinction in its

briefing at the agency level.   See Pet'r's Prehearing Br. at 22, PD 309, CD 953, 960,

Doc. No. 699961, (Jan. 21, 2020) ("While complete PEMBS have their own standards

that apply to the finished building, the structural components are required to comply

with AISC standards, similar to all in-scope FSS.").

Finally, after determining that the captive production provision was

inapplicable, the Commission was not obligated to consider captive production a

pertinent condition of competition.   The Commission explained, "given the nature of

the 'internal transfer' involved, we do not find that captive consumption, as we

normally consider that term, is a pertinent condition of competition."   Final Views at

43 n.189.   It is reasonably discernible from the Final Views that the "nature of the

internal transfer" referred to in note 189 means that the only actions FSS producers

---

[19] Despite Plaintiff's contention, see Pl.'s Br. at 47, the fact that "beginner-level
workshops" are offered, does not mean that "anyone" can construct a PEMBS. Teams
of professional builders construct PEMBS, which are one- and two-story buildings,
shopping centers, warehouses, arenas, motels, and office complexes.   See Final Views
at 16, 18.

take following production of the FSS is to (sometimes) aggregate the FSS with non-FSS components and then ship the FSS to a job site.  See id. at 42–43.  Thus, the "internal transfer" is unlike the vertical integration that Congress describes in the SAA.  See SAA at 852.  Here, there is no vertical integration and the U.S. producers do not internally transfer the FSS "for further internal processing." SAA at 852; see Final Views at 43.  In these circumstances, it was not unreasonable for the Commission to find that captive consumption was not a pertinent condition of competition.  The Commission's determinations with respect to captive production and consumption are sustained.

## IV.   Commission's Material Injury Determination

### A.   Underselling

In evaluating the price effects of subject imports under 19 U.S.C. § 1677(7)(B)(i)(II), the Commission shall consider whether—

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States . . .

19 U.S.C. § 1677(7)(C)(ii)(I).  In so doing, the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports," id. § 1677(7)(B)(ii), and shall examine any such "relevant economic factors described [in id. § 1677(7)(C)] within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  Id. § 1677(7)(C).

The Commission's determination that it lacked substantial evidence that cumulated subject imports undersold the domestic like product is reasonable in light of the record as a whole. The Commission considered total bid data from U.S. purchasers, Final Views at 53–55, itemized bid data, id. at 58, average unit value ("AUV") data with detailed breakouts, see id. at 58, and data derived from responses to its lost sales and revenue survey. Id. at 58–59. The Commission also considered pricing data examined in the preliminary phase, but determined that because of the inaccuracies in that data, the data did not "provide a sufficient basis to make findings about the relative price levels." Id. at 53.

First, the Commission relies on total bid data from U.S. purchasers, which it reasonably concludes does not demonstrate the existence of significant underselling during the POI. Id. at 53–55. Most of the bid data was not itemized in such a way as to enable the Commission to specifically identify a separate cost-component attributable to FSS. See id. at 49, 55–57. In light of conflicting evidence presented by the parties as to what cost-share of a typical project is attributable to the value of FSS,[20] it is not unreasonable for the Commission to conclude that the data does not

---

[20] Plaintiff contends that the Commission incorrectly stated that AISC publications put the cost share of FSS was "'between 25% and 75%, depending on the scope of the project.'" Pl.'s Br. at 8–9 (citing Final Staff Report at II-11–II-12). Instead, Petitioner argued the correct cost share was 75%. Pl.'s Br. at 9. The Commission however considered the record evidence cited by the Plaintiff supporting Plaintiff's view of the cost share of FSS, but nonetheless after weighing the evidence decided that the cost share of FSS could vary greatly and did "not necessarily constitute a majority or fixed proportion of the total bid." See Final Views at 56–58.

reliably permit a factual finding that cumulative subject imports had adverse price effects on domestic producers. See id. at 55–57.  It is reasonably discernible that the Commission reasonably decided not to rely on non-itemized bid data because it could not determine what portion of the bid data were for FSS and what portion were for services such as erection services.  See id. at 55–58.  It is reasonably discernible that the Commission reasonably concluded that bids where the main component of cost was something other than FSS would be less probative of whether imports of FSS were having an adverse price effect on domestic producers.  See id. at 55–58.  Thus, it stands to reason that the Commission assigns less weight to the data not itemized and the record does not establish a typical range for FSS cost-share.

Moreover, the Commission examined the bid data to determine to what extent the lowest bid prevailed.  Id. at 54–55.  Comparing bid data for which there was a bid involving at least one domestic supplier and one supplier from Canada, China, or Mexico, the Commission collected usable bid data from 14 purchasers for 40 different projects.  Id. at 53.  Although 18 of 19 bids won by subject imports were lower total bids, in a number of cases the higher bid won the project.[21]  Id. at 54.  Plaintiff asserts

---

[21] The Commission found that a higher total bid was successful over a lower bid in 16 instances.  See Final Views 54–55 nn.264–66.  Plaintiff complains that the analysis of these 16 projects "inexplicably veered away from comparing domestic and subject prices, and into comparing domestic prices with other domestic prices, and subject prices with other subject prices."  Pl.'s Br. at 19.  Plaintiff challenges the lack of

(footnote continued)

that the Commission's methodology and analysis improperly imposes a universal lowest price requirement to find underselling.[22]  Pl.'s Br. at 18–19.  However, the Commission reasonably explains that the fact that the lowest priced bid did not always win was "one limitation to use of the total bid data."  Final Views at 55.  Record evidence supports the Commission's determination that factors other than price informed purchasing decisions.  Id. at 48 n.217.  The Commission observes that the lowest bid does not prevail in many instances, and it is reasonable for the Commission to infer, particularly in light of corroborating responses to its questionnaire, that such conditions of competition further limit the probative value of the bid data.  See id. at 54–55 nn.261–66.

Further, the Commission reasonably found that lost sales data did not support a finding of significant underselling.  The Commission concluded that the lost sales accounted for a small volume during the POI and did not correlate to the loss of

---

explanation as to why the Commission did not limit itself to comparing domestic to subject bids.  Id. at 19–20.  However, the Commission states "we find that the domestic like product and cumulated subject imports have a moderate-to-high degree of substitutability, and that price is one of several important factors in purchasing decisions for FSS."  Final Views at 52.  It is reasonably discernible from this statement that the Commission sought to assess the importance of price in the industry as a whole.  Further, Plaintiff argues that the lowest bid did win in most instances when bids awarded to a single fabricator competing with at least one other bid.  Pl.'s Br. at 20.  Nonetheless, by proposing another way to look at the evidence the Plaintiff is asking the court to reweigh the evidence.

[22] The Commission did not impose a universal lowest price requirement, rather it took account of the factors including price which influenced purchasers in order to assess the probative value of the bid data.  See Final Views at 55.

market share.  See id. at 59.  The Commission noted that domestic producers'
shipments increased by more than the total lost sales volume during the POI.  Id.
Although Plaintiff queries why the Commission's comparison of lost sales volume to
the increase in domestic shipments is relevant to the Commission's analysis, Pl.'s Br.
at 27, it is reasonably discernible that the Commission made its comparison to
provide context.  See Final Views at 59.  The Commission must determine whether
there is significant underselling, an inquiry that is necessarily done on a case-by-case
basis.  See 19 U.S.C. § 1677(7)(C)(ii)(I).  The degree of lost sales as compared to the
market is therefore not irrelevant and is part of the evidence that the Commission
weighs.  It is not the court's role to reweigh that evidence.  The Commission further
explained that the lost sales did not correspond to a loss in market share to importers,
and in fact the domestic industry's market share increased during the POI.  Id.
Further, the Commission found that the data contained substantial ambiguities with
respect to lost sales.  Id. at 59 n.289.  The Commission drew that inference from the
fact that the bid data did not itemize FSS cost.  Id. at 55, 59.  So even where lost sales
and revenue responses indicate that price is the primary reason for purchasing a
product, the Commission could not attribute that to the price of FSS.  Id. at 59. Thus,
the Commission's determination that the lost sales data does not support a finding of
underselling is supported by substantial evidence.

The Commission also reasonably found that the detailed AUV data were not
probative of underselling.  Although the Petitioner argued that lower AUVs for U.S.

**PUBLIC VERSION**

shipments of subject imports evidence that the subject imports undersold the domestic like product, Posthearing Brief of Pet., Fabricated Structural Steel from Canada, China, and Mexico, Investigation Nos. 701-TA-614-617 and 731-TA-1432-1434 (Final) at 9, PD 344 CD 1001, 1012 (Feb. 4, 2020), the Commission concluded that the nature of FSS production was project specific and therefore differences in AUVs would not necessarily "reflect differences in FSS prices between subject imports and the domestic like product." Final Views at 58. The court cannot say that the Commission's determination, given the evidence, is unreasonable. The project specific uses of FSS may result in significantly different costs for different projects.[23] Averaging values masks significant differences in costs. Thus, it is not unreasonable for the Commission to find AUVs not probative of underselling.

Finally, the Commission reasonably believed the problems with the pricing product data would not be adequately addressed by the inclusion of an additional pricing product category or additional time to conduct the investigation. See id. at 53. Most of the firms the Commission requested pricing product data from did not provide usable responses. USITC Publ. 4878 at V-8–9 n.40. The Commission observed that many of the firms experienced difficulty completing the questionnaire responses, and

---

[23] The Commission found that over 99 percent of the commercial shipments by U.S. producers and importers were produced-to-order. Final Views at 72. Plaintiff's arguments concerning the breadth of the AUV data, Pls.' Br. at 30, ask this court to reweigh the evidence already considered by the Commission. See Final Views at 58 n.280.

further noted irregularities and apparent inaccuracies in the data the firms did

report.  See Confidential Views of the Commission (Prelim.) at 49  CD 312, Doc. No.

671868 (Apr. 1, 2019) ("Prelim. Views").  Therefore, the Commission's decision not to

assign weight to this data is reasonable.

### B.        Price Suppression & Depression

In evaluating the price effects of subject imports, the Commission shall also

consider whether "the effect of imports of such merchandise otherwise depresses

prices to a significant degree or prevents price increases, which otherwise would have

occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(II).  In so doing, the

Commission "may consider such other economic factors as are relevant to the

determination regarding whether there is material injury by reason of imports," id. §

1677(7)(B)(ii), and shall examine any such "relevant economic factors described [in

19 U.S.C. § 1677(7)(C)] within the context of the business cycle and conditions of

competition that are distinctive to the affected industry."  Id. § 1677(7)(C).

The Commission reasonably explains that the record does not support a finding

that cumulated subject imports depressed prices. Final Views at 60–62.  Although it

assigns limited probative value to the AUV data for the purposes of establishing

underselling, the Commission explains that the AUV data showed trends "of

increasing domestic prices during the POI." Id. at 60 (citing Final Staff Report at

Table C-4).  The Commission corroborates its finding by pointing out that only three

of 33 responding purchasers indicated that they reduced prices to compete with

subject imports. Id. at 60 n.292. Plaintiff challenges the Commission's representation of the record, see Pl.'s Br. at 37–38, because 22 of those responding purchasers indicated that they do not know whether they reduced prices. See Final Staff Report at V-23. However, Plaintiff's challenge only serves to further support the Commission's view that the record lacks evidence to demonstrate injury. Plaintiff does not direct the court to any evidence that would contradict or impugn the Commission's reasoning.[24] Id.

Likewise, the Commission's finding that prices were not suppressed to a significant degree is reasonable. The Commission acknowledges record evidence showing an increase in industry-wide cost of goods sold ("COGS") to net sales ratio between 2016 and 2018,[25] but reasonably concludes that the increase is not significant in view of an extremely fragmented industry comprised of "over a thousand fabricators that have considerable variation in their operations." Final Views at 60 n.294 (citing, inter alia, USITC Pub. 4878 at 25). The Commission supports its conclusion with company-specific financial data from ten of the largest U.S. producers in 2018 showing "tremendous variability across firms in their COGS to net sales ratios, the trends in those ratios, unit raw material costs, and the trends

---

[24] Plaintiff argues the inadequate record creates the evidentiary deficiency. Pl.'s Br. at 38–40 However, as explained above, the suggestions for additional data collection offered by Petitioner did little to address data problems. See Final Views at 52–53 nn.254, 256.
[25] The increase was [[    ]] percentage points. Final Views at 60 n.294.

in those costs." Id. (citing Final Staff Report at Table G-1); see also Final Staff Report

at G-5.  The Commission also finds "that revenues increased by more than its COGS

on both an overall and per-unit basis", Final Views at 61 (citing Final Staff Report at

Table C-4), and that the industry was able to "substantially increase its prices during

this period by more than the increase in raw material costs" between 2016–2018.  Id.

(citing Final Staff Report at Table VI-3, Table C-4).  Contrary to Plaintiff's attempt

to qualify variations among the top producers as being inconsequential, see Pl.'s Br.

at 36, which really is a request for the court to reweigh the evidence, the financial

data, taken together with its other factual findings, support the Commission's

conclusion that the increase in industry-wide COGS to net sales ratio between 2016

and 2018 does not reasonably demonstrate the existence of price suppression during

the POI.

### C.   Impact

With respect to its examination of the impact of subject imports under 19

U.S.C. § 1677(7)(B)(i)(III), the Commission shall

> evaluate all relevant economic factors which have a bearing on the state
> of the industry in the United States, including, but not limited to—
>
>> (I) actual and potential decline in output, sales, market share,
>> gross profits, operating profits, net profits, ability to service debt,
>> productivity, return on investments, return on assets, and
>> utilization of capacity,
>> (II) factors affecting domestic prices,
>> (III) actual and potential negative effects on cash flow,
>> inventories, employment, wages, growth, ability to raise capital,
>> and investment,

> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
> (V) in a proceeding under subtitle B [19 USCS §§ 1673–1673h], the magnitude of the margin of dumping.

Id. § 1677(7)(C)(iii). No particular factor is dispositive, and all relevant factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry" must be considered. Id.

The Commission's determination that subject imports did not have a significant impact on the domestic industry is reasonable and supported by substantial evidence. The Commission found "substantial increases between 2016 and 2018 in capacity, production, capacity utilization, net sales quantity, U.S. shipments, market share, productivity, revenues, gross profit, operating income, and net income, and capital expenditures." Final Views at 63. The Commission further explained that the domestic industry's capacity supported its determination.[26] Final

---

[26] The Commission found that the domestic industry's capacity increased by [[    ]] percent between 2016 and 2018." Final Views. at 64. Likewise, capacity rose from [[    ]] percent in 2016 to [[    ]] percent in 2018. Id. "Net sales increased by [[    ]] percent from 2016 to 2018 . . . [and] U.S. shipments increased by [[    ]] percent from 2016 to 2018." Id. Moreover, "The domestic industry's share of apparent U.S. consumption increased from [[    ]] percent in 2016 to [[    ]] percent in 2017 and [[    ]] percent in 2018; it was [[    ]] percent in interim 2018 and lower, at [[    ]] percent in interim 2019." Id. at 65. The Commission also noted that the domestic industry's "[r]evenues rose by [[    ]] percent from 2016 to 2018 . . . [and] [g]ross profit rose by [[    ]] percent from 2016 to 2018." Id. Operating income also rose by [[    ]] percent from 2016 to 2018, and net income rose by [[    ]] percent over the same period. Id. at 65–66.

Views at 63–64.  Given these and other positive changes to domestic industry during the POI, <u>see generally</u> <u>id.</u> at 63–66,[27] the Commission's determination that the domestic industry was not significantly impacted by subject imports was supported by substantial evidence.[28]  <u>See</u> <u>id.</u> at 67.

Plaintiff contends that the Commission did not sufficiently analyze the broader market conditions, specifically in the context of what Plaintiff calls the "natural experiment" of the different markets for domestic producers of FSS for PEMBS and domestic producers of FSS not for PEMBS.  Pl.'s Br. at 51.  However, contrary to Plaintiff's contention, the Commission did discuss the broader market conditions.  <u>See</u> Final Views at 66.   The Commission analyzed the above performance indicators in the context of an increase in apparent U.S. consumption,[29] and found that many of those indicators significantly outpaced the increased consumption.  <u>Id.</u> at 66.  The Commission also found no evidence to support Plaintiff's argument that the domestic industry should have performed even better than it did but for the subject imports. <u>Id.</u> at 66–67, 67 n.323.  Instead, the Commission cited record evidence demonstrating that after the volume of subject imports fell in response to Section 301 tariffs imposed

----

[27] Other positive changes include increased ending inventories, increased share of U.S. consumption, and increased wages paid to domestic workers.  <u>Id.</u>
[28] Plaintiff also claims that the Commission failed to adequately address post-petition effects. Pl.'s Br. at 52–53.  The Commission addressed the post-petition effects.  <u>See</u> Final Views at 51.  Plaintiff's disagreement with the Commission's determination does not make the Commission's consideration of post-petition effects inadequate.
[29] The increase was an 5.9 percent increase.  <u>Id.</u> at 66.

on imports from China, the domestic industry was unable to improve its performance

and its market share decreased in interim 2019.  Id. at 51 n.248.[30]

Moreover, the Commission was under no obligation to analyze different parts

of the domestic industry in isolation.  See e.g., CP Kelco US, Inc. v. United States, 38

CIT __, 24 F. Supp. 3d 1337, 1346–47 (2014) (holding that the Commission's statutory

authority gave it discretion on how to analyze industry data).  The Commission

adopted Petitioner's argument that the domestic industry was singular; therefore,

the Commission was not required to analyze the impact of subject imports on

different segments of the domestic industry.  Id.; Final Views at 13, 15.  Plaintiff fails

to explain how the performance of one segment of the domestic industry undermines

the Commission's finding that the industry as a whole was not materially injured.

---

[30] The Commission reasonably concluded that the decrease in subject imports from China during the POI was caused solely by the imposition of Section 301 tariffs.  See id. at 51 n.248.  Petitioner contends that although the petitions were not filed until February 2019, [[                                                                                          ]] and Respondents knew of the petitions by December 2018, and that knowledge was at least a partial cause of the decreased volume of subject imports.  [AISC's] Memo. in Supp. of [Pl.'s Mot.] (Revised Confidential Version), Sept. 21, 2020, ECF No. 54 at 52–53; see also Final Views at 51, 51 n.248.  However, the Commission found subject imports increased from April 2018 through August 2018, and then dropped by over 50% from August 2018 to September 2018 following the announcement of the imposition of Section 301 tariffs.  Final Views. at 51 n.248; Final Staff Report at IV-20, Table IV-7.  Subject import volumes decreased further in late 2018 and then remained consistently below August 2018 levels through interim 2019.  Id.  Moreover, it was only imports from China that decreased; imports from Canada and Mexico, which were not subject to Section 301 tariffs but were the subject of the petitions, of which Plaintiff contends [[                                        ]] did not similarly decrease. Id.  These facts support the Commission's conclusion that the Section 301 tariffs, not the petitions, were the cause of the decrease in volume.

Contrary to Plaintiff's argument, having reasonably determined that underselling was not present, the Commission was not obligated to find that the larger percentage of imported merchandise in the non-PEMBS segment of the market caused the relatively worse performance of that segment during the POI. See Pl.'s Reply Br. at 27–28.

Furthermore, the Commission explains that when subject imports decreased in interim 2019, the domestic industry was unable to increase its market share, undermining Plaintiff's argument that the domestic industry should have performed better than it did as a result of the larger percentage of imported merchandise in the non-PEMBS segment of the market. Final Views at 66–67. Even taking Plaintiff's arguments at face value, that domestic producers of FSS not for use in PEMBS demonstrated weaker performance than other segments of the industry during the POI does not take away from the substantial evidence supporting the Commission's conclusion that the industry as a whole improved its performance and was not significantly impacted by subject imports, as discussed above.

Plaintiff's concerns regarding certain economic indicators that fell during the POI asks the court to reweigh the evidence that the Commission already considered.[31]

---

[31] Plaintiff asserts that the domestic industry "was unable to maintain its profitability," and "should have been able to increase prices significantly" due to prevailing economic conditions. Pl.'s Br. at 50 (quoting Final Views at 79). Plaintiff also asserts that unit operating income fell, operating margins decreased, and the number of domestic producers operating at a loss increased during the POI in the non-PEMBS segment of the industry. Id. at 51.

<u>See</u> Pl.'s Br. at 50–51; Final Views at 63–67.  The court recognizes that reasonable minds might come to different conclusions regarding the impact of the subject imports on domestic industry given the conflicting evidence, but that is not enough to remand the Commission's determination.   The Commission's impact determination is sustained.

## CONCLUSION

For the reasons stated the Commission's determination that an industry in the United States is not materially injured by reason of subject imports of FSS from Canada, China, and Mexico that are sold in the U.S. at less than fair value and subsidized by the governments of China and Mexico is sustained.  Judgment shall enter accordingly.

 /s/ Claire R. Kelly 
Claire R. Kelly, Judge

Dated:      September 22, 2021
            New York, New York